
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2016

## STATE OF TENNESSEE v. ADARIUS DEWAYNE GARTH

**Appeal from the Criminal Court for Hamilton County**
**No. 292042   Thomas C. Greenholtz, Judge**

_____

**No. E2016-00931-CCA-R3-CD**

_____

Defendant, Adarius Dewayne Garth, was indicted by the Hamilton County Grand Jury for two counts of attempted first degree murder, domestic aggravated assault, aggravated assault, reckless endangerment, and employing a firearm during the commission of a dangerous felony. Defendant entered an "open" guilty plea to the lesser-included offense of reckless aggravated assault, and the remaining charges were dismissed on motion by the State. Following a sentencing hearing, the trial court sentenced Defendant to four years' incarceration as a Range I offender. Defendant appeals the length and manner of service of his sentence. Following a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Steven E. Smith, District Public Defender; and Kevin L. Loper, Assistant Public Defender, Chattanooga, Tennessee, for the appellant, Adarius Dewayne Garth.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; M. Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts*

The State offered the following factual basis at Defendant's plea submission hearing:

Your Honor, if this case had gone to trial, the facts would have been as follows, that on or about March 17, 2014, here in Hamilton County, Tennessee, police were dispatched to a person shot at 3704 West Avenue. When they arrived and found Tanika Caldwell, she had been shot. She was laying [sic] in the kitchen. There were several witnesses there, including the defendant. Essentially all of the witnesses stated that there had been a car that had driven by and shots were fired into the home and Ms. Caldwell was struck. [Defendant] also[,] as one of the witnesses[,] indicated that to the police.

There was a 911 call placed by [Defendant] in which he indicated that as well. That she had been shot and there had been a car that had driven by.

As the investigation – Ms .Caldwell was taken to the hospital, she had a gunshot wound to her jaw. Apparently she was two months pregnant with the defendant's child at the time of the shooting. She was released at a later date. The investigation continued at that point. They spoke with Ms. Caldwell. She indicated that she wasn't really aware of what happened, that she just knew that she was shot. They re-interviewed some of the witnesses and one of the witnesses indicated that there had not been a drive-by shooting, that [Defendant] – that they heard a gunshot, looked in the kitchen, saw [Defendant] in the kitchen with a firearm, and [Defendant] had told this witness that he had better not say that he had done it, that he would take steps to make sure that they didn't say that he had done it. There was no firearm ever recovered in the incident.

They interviewed the victim again and she indicated that she saw [Defendant] standing beside her, that she saw [Defendant] point a gun at her and then fire the weapon. She did give testimony at a preliminary hearing and at that preliminary hearing her story changed a little bit again. She said she doesn't know who – she said she didn't know who shot her. That she was standing in the kitchen with two individuals, one of whom was [Defendant], and that the next thing she knew she had been shot and she was on the floor.

[Defendant] was not taken into custody the night of the shooting. After the officers re-interviewed the witnesses they charged – they swore out warrants for [Defendant] and he was taken into custody about a month after that. He did give a statement to the police. It was recorded

after he waived his *Miranda* rights. He indicated that he did shoot Ms. Caldwell, that it was an accident. That she went outside, got a gun from the outside that she had found near the trash can, came in, that she handed him the gun and that while she was handing him the gun the gun went off and shot her in the jaw. That was the defendant's statement. It doesn't really fit with the proof. But the State has had limited cooperation from the victim in this case and also the witnesses. The State feels that there would be the possibility that Ms. Caldwell would be declared unavailable and that her prior sworn testimony would be introduced at trial. There's no guarantee that that would happen, but that would be something that the State – a possibility for the State of Tennessee in that proof. And along with the defendant's statement to the police after waiving his Miranda rights, the State feels that the disposition of reckless aggravated assault is appropriate. That the State probably could not meet its burden for attempted murder. So that's the reason for the reduction.

### *Sentencing hearing*

A presentence report was admitted as evidence at the sentencing hearing. The State also introduced without objection a recording of the 911 call, Defendant's recorded statement to the police, the victim's medical records, and an order revoking Defendant's probation in a prior conviction.

Taylor Walker, of the Chattanooga Police Department, was assigned to investigate the shooting. He responded to the victim's residence, where the shooting occurred. The victim's two young children were present, and the victim was pregnant with Defendant's child at the time of the shooting. Officer Walker observed a large pool of blood on the far side of the kitchen that led to a hallway. He observed food items on the table, and it appeared that the victim had been preparing dinner when she was shot. Four witnesses, including Defendant, were transported to the "service center" to be interviewed.

Officer Walker interviewed the victim at the hospital either on the night of the shooting or the following day. The victim was heavily sedated, and she could not speak due to the injury to her mouth. Officer Walker testified that there was stippling around the victim's jaw area.

The victim's mother contacted Officer Walker, and they spoke several times. Nakita Jones was re-interviewed on the day after the shooting. Officer Walker also requested a forensic interview with the victim's four-year-old child. The victim, her son, and the victim's mother were present for the interview at the child advocacy center.

Officer Walker also interviewed the victim again at the child advocacy center. Based on those interviews, Officer Walker "took out warrants" for Defendant's arrest, charging him with attempted first degree murder, aggravated domestic assault, reckless endangerment, and unlawful possession of a firearm. Defendant was arrested on April 27, 2014.

Officer Walker interviewed Defendant after his arrest. Defendant stated that he was standing between the kitchen and living room, and he heard two or three gunshots. He stated that he heard tires screech, and he looked over and saw that the victim had been shot. Officer Walker interviewed Defendant again on April 28, 2014. Defendant stated that he was in the kitchen with the victim. The victim took the trash outside, and she found a handgun outside. She brought the gun inside and handed it to Defendant. Defendant stated that the victim was holding the barrel, and when he grabbed the gun by the handle, it fired accidentally. Officer Walker testified that his investigation did not support either of Defendant's statements.

Kenneth Fairchild, an employee of Hamilton County Community Corrections, testified that the trial court ordered Defendant to wear a GPS monitor as a pretrial condition of bond, but that Defendant was not on house arrest. Defendant was ordered not to go within 500 feet of the victim's home. On February 25, 2016, Mr. Fairchild filed a violation of the GPS conditions. Mr. Fairchild testified that Defendant failed to charge the battery and respond to notifications, and Defendant "repeatedly" failed to pay his GPS monitoring fees. Mr. Fairchild testified that he had "multiple" discussions with Defendant about charging the battery. In February, the battery had gone into "critical stage at least eight times and had gone into failure for not being charged four times."

Phil Lynch testified on behalf of Defendant. He testified that Defendant had been employed part-time at his business since August, 2015. Mr. Lynch testified that Defendant had "done a good job[,]" and he hoped to "get him back" as an employee. Mr. Lynch expressed his desire to give Defendant a "second chance or opportunity to do better." He testified that Defendant "perform[ed] his job very well." He testified that Defendant's paycheck was garnished for child support.

David Wiley was a minister at Brainerd Baptist Church. He met Defendant approximately three years earlier through a prison ministry at the Hamilton County jail. Defendant was initially very quiet, but he changed and began "studying the word." Mr. Wiley testified that in the time he had known Defendant, Defendant had become "a dramatically different person." Mr. Wiley believed that Defendant had changed for the better and that his change was "legit." Defendant maintained contact with Mr. Wiley after he was released from jail. Mr. Wiley testified that other members of Defendant's family had also started attending church.

Defendant's mother, Marie Jones, testified that Defendant was "a pretty good kid." She testified that he reads the Bible and does housework and yard work for her. She testified that Defendant was 24 years old and that he lived with her. She testified on cross-examination that detectives came to her house attempting to locate Defendant after the shooting. Defendant was not there, and he never returned home after the shooting and before he was arrested.

Dejay Trip testified that she was Defendant's girlfriend and pregnant with his child. She testified that Defendant was good to her and was going to take care of her and their child because he was working. She and Defendant lived with her grandmother in an apartment. She testified that Defendant also lived with his mother and went "back and forth." She testified that Defendant had three other children with other women.

Defendant gave an allocution. He expressed remorse and testified that he had "learned from [his] previous mistakes." He testified that he was "a changed person[.]" He expressed his desire "to be a strong family man[,]" to take care of his children, and to make "an honest living" and "contribute to [ ] society."

At the conclusion of the sentencing hearing, the trial court noted that Defendant pleaded guilty to a Class D felony as a Range I offender, and the possible sentence range was two to four years. The court noted Defendant had a prior history of criminal offenses. Defendant had a previous conviction for aggravated burglary, a Class C felony. He also had six misdemeanor convictions, including criminal trespass, theft, failure to appear, and possession of drugs. Defendant had also violated probation twice as a juvenile. The court noted from the presentence report that Defendant's probation supervisor indicated that Defendant's progress under intensive probation was "poor."

The trial court stated that it considered the evidence presented at the sentencing hearing as well as "the record as a whole," the presentence report, and the principles of sentencing, including imposing punishment to prevent crime and to promote respect for the law. The court also considered the nature and characteristics of the criminal conduct involved, the evidence and arguments offered by the parties as to mitigating or enhancement factors, and the statistical information provided by the Tennessee Administrative Office of the Courts for similar offenses. The court also considered Defendant's allocution statement.

The trial court found that Defendant had a previous history of criminal conduct; that Defendant previously failed to comply with the conditions of a sentence involving release into the community; that Defendant had no hesitation about committing a crime when the risk to human life was high; and that Defendant was adjudicated to have

committed a delinquent act that would constitute a felony if committed by an adult. The trial court considered the mitigating factors argued by Defendant. The court found that Defendant lied to the police on two occasions, and that showed "very well that he was aware of the seriousness of his actions and the consequences of his actions." The court also found by a preponderance of the evidence that Defendant "did go on the run for a while and that he left home right after the offense was committed on March 17th and then frankly never returned." The court found that Defendant's actions showed that Defendant had "a full appreciation for the seriousness of the acts that were involved." The court gave "some weight" to Defendant's efforts at rehabilitation, his work ethic, and that Defendant had called 911. The court found, however, that the applicable enhancement factors "substantially outweigh the mitigation factor[,]" and the court imposed the maximum sentence of four years.

The trial court next considered whether to grant Defendant's request for an alternative sentence. The court noted that it had to consider "a number of factors" in determining whether to grant an alternative sentence. The court considered the presentence report, the facts and circumstances surrounding the offense, and the nature of the criminal conduct involved. The court noted that the criminal conduct was "extremely serious" because the victim was "shot in the face" while she was "nine weeks pregnant." The court also considered that Defendant discharged the weapon while in a house with children and other people present. The court noted that Defendant lied to the 911 operator and to the police in his first interview, when he stated that he was not the shooter. The court considered Defendant's potential for rehabilitation and found that Defendant's lack of candor and failure to accept responsibility for his actions weighed against application of that factor. The court found that there was "very little evidence that [Defendant was] actually remorseful for the harm and the damage that [he had] caused [the victim,]" and the court noted that Defendant did not express remorse for causing the victim's injuries.

The trial court found that Defendant had "a history of probation violations." The court considered whether measures less restrictive than confinement have been frequently or recently applied unsuccessfully to Defendant. The court noted that Defendant failed to appear for his first sentencing hearing in this case. The court stated, "that had everything to do with you not wanting to take responsibility until you were arrested and brought in and forced to take responsibility for it."

The trial court found that there was a presumption that Defendant was a favorable candidate for alternative sentencing. The court concluded, however, that the presumption was "rebutted in this case." The court found that confinement was necessary to avoid depreciating the seriousness of the offense and that Defendant's actions were "especially

shocking, reprehensible, and offensive." The court ordered Defendant to serve his sentence in confinement.

*Analysis*

On appeal, Defendant challenges both the length and manner of service of the sentence imposed by the trial court. Specifically, he argues that the trial court erred in its application of mitigating factors and in denying probation. The State contends that the trial court did not abuse its discretion by finding that the applicable enhancement factors outweighed the mitigating factors, nor did the trial court abuse its discretion by imposing a sentence of incarceration.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. §§ 40-35-210(b)(1)-(7). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id*. § 40-35-103(5). The court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id*. §§ 40-35-103(2), (4).

Our review of the record supports the trial court's imposition of the maximum sentence in this case. As an initial matter, Defendant was a Range I, standard offender and subject to a sentencing range of two to four years for the offense of reckless aggravated assault, a Class D felony. *See id*. § 40-35-112(a)(4). Thus, the trial court's four-year sentence was within the applicable statutory range and presumed reasonable.

In determining the appropriate length of Defendant's sentence, the trial court relied upon several enhancement factors, including factors (1), (8), (10), and (16): that Defendant had a previous history of criminal convictions or criminal behavior in addition

to those necessary to establish the appropriate range; that, before trial or sentencing, Defendant had failed to comply with the conditions of a sentence involving release into the community; that Defendant had no hesitation about committing a crime when the risk to human life was high; and that Defendant was adjudicated to have committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. *See* T.C.A. §40-35-114.

Defendant argues that the trial court abused its discretion in finding that Defendant had no hesitation about committing a crime when the risk to human life was high. In considering that enhancement factor, the trial court noted that it did not weigh that factor "as heavily as it would have" because defense counsel argued that the shooting was accidental. Our supreme court has noted that even if a trial court misapplies an enhancement factor, if other evidence supports the sentence, this court must affirm the decision of the trial court. In *State v. Bise*, the court noted:

> [A] trial court's misapplication of an enhancement . . . factor does not invalidate the sentence imposed unless the trial court wholly departed from the [Sentencing] Act . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

380 S.W.3d 682, 706 (Tenn. 2012).

Here, the record shows that the trial court carefully considered the sentencing principles and applicable enhancement and mitigating factors, and the trial court imposed a sentence within the applicable range and made the requisite findings in support of its ruling.

Next, Defendant argues that the trial court erred by denying an alternative sentence. Any sentence that does not involve complete confinement is an alternative sentence. *See generally State v. Fields*, 40 S.W.3d 435 (Tenn. 2001).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Stating again, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

An offender is eligible for an alternative sentence if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. *See* T.C.A. § 40-35-303(a). A defendant with a total effective sentence greater than ten years is still eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements. *State v. Langston*, 708 S.W.2d 830, 832-33 (Tenn. 1986). A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* T.C.A. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). Tennessee Code Annotated section 40-35-102(6) is now only advisory. *See* T.C.A. § 40-35-102(6)(D).

Additionally, no criminal defendant is automatically entitled to probation as a matter of law. *See State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. *See Carter*, 254 S.W.3d at 347 (citing T.C.A. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956), *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). The same considerations attendant to the determination whether to place a defendant on judicial diversion are relevant to a decision whether to grant other forms of alternative sentencing. *See State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App.

1995), *overruled on other grounds*, *Hooper*, 29 S.W.3d at 9 (noting that the "same guidelines are applicable in diversion cases as are applicable in [alternative sentencing] cases").

We agree with the State that the record supports the trial court's denial of probation or other alternative sentencing. The record reflects that the trial court carefully and at length considered the relevant sentencing principles and applied them to the facts of the case. The trial court's decision to deny alternative sentencing was supported by clearly articulated reasons, and Defendant has failed to prove that the court abused its discretion or that he is otherwise a good candidate for an alternative sentence. Accordingly, Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing analysis, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE